IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| DUNCAN-WILLIAMS, INC., | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 09-2098 |
| | ) |           09-2109 |
| CAPSTONE DEVELOPMENT, LLC; | ) | |
| EUGENE H. BORGOSZ; SELECTIVE | ) | |
| SERVICES, INC. f/k/a | ) | |
| SELECTIVE, INC.; UNIVERSITY | ) | |
| CLUB GROUP, INC.; UC | ) | |
| PROPERTIES, LLC; TANNER & | ) | |
| GUIN, LLC; TRIANGLE | ) | |
| CONSTRUCTION MANAGEMENT, LLC; | ) | |
| NEXSON PRUET, LLC; HILBURN, | ) | |
| CALHOON, HARPER, PRUNISKI & | ) | |
| CALHOUN, LTD.; and CAPSTONE | ) | |
| IMPROVEMENT DISTRICT, | ) | |
| | ) | |
|    Defendants. | ) | |

---

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL
JURISDICTION**

---

Before the Court are the separate February 25 and March 12,
2009, Motions to Dismiss for Lack of Personal Jurisdiction filed
by Defendants Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.
("Hilburn"); Tanner & Guin, LLC ("Tanner"); and Capstone
Development, LLC, Selective Services, Inc., Triangle
Construction Management, LLC, and Eugene H. Borgosz (the
"Borgosz entities"). See Fed. R. Civ. P. 12(b)(2); (Dkt. Nos.

3*, 4, 15.)[1]   Plaintiff Duncan-Williams, Inc. ("DWI") filed a response in opposition on April 13, 2009.  (See Dkt. No. 35.) Defendants filed reply briefs on May 19, June 3, and June 5, 2009.  (See Dkt. Nos. 26*, 46-47.)  DWI filed its sur-reply on June 26, 2009.  (See Dkt. No. 50.)  For the following reasons, the Court GRANTS the Motion to Dismiss of Defendant Tanner but DENIES the Motions of the Borgosz entities and Hilburn.

## I.   FACTUAL BACKGROUND

### A. Underlying Dispute

Plaintiff DWI is a securities firm based in Memphis, Tennessee.  (Plaintiff's Response in Opposition to Defendants' Motions to Dismiss at 4.) ("Pl.'s Resp.")  Pursuant to arrangements with the Defendants, DWI acted, along with the South Carolina-based securities firm Southern Financial, Inc., as underwriter for a $13 million bond offering to fund the construction of a 544-lot residential development in Brookwood, Alabama, known as the Capstone Development.  (Compl. ¶ 15.) Defendant Capstone Improvement District (the "District"), a political subdivision of the State of Alabama created by an act of that state's legislature, issued the bonds.  (Id. ¶ 17.)  The developer for the real estate project was Defendant Capstone Development, LLC (the "Developer"), which is one of the Borgosz

---

[1] All docket entries referenced with an asterisk (*) are filed in case number 09-2109.

entities.    (Id. ¶ 15.)    DWI and Southern Financial each purchased half of the bonds issued.   (Id. ¶ 23.)   After its purchase of the bonds, DWI re-sold them to its customers as investments. (Id. ¶ 24.)

Defendants Selective Services, Inc. ("Selective") and Triangle Construction Management, LLC ("Triangle Construction") were in charge of the construction of the Capstone Development. (Id. ¶¶ 45-46.)   Defendant Eugene Borgosz owned, controlled, or was an agent of both Selective and Triangle Construction.   (Id. ¶¶ 4-5.)   In 2001, the Capstone Development "began to experience cost overruns."    (Id. ¶ 43.)    Selective and Triangle Construction eventually walked off the job, refusing to complete construction given the increasing costs.   (Id. ¶ 45.)   Despite a bond guaranteeing completion of the Development, the Developer did not hire a replacement construction company, and the Capstone Development was never completed.   (Id. ¶¶ 47, 49-50.) Because the Development was not completed and few lots were sold, no funds were available to pay interest and principal to the bondholders.   (Id. ¶ 50.)   There was also no collateral backing the bonds because the Development had failed.   (Id.) The bonds defaulted in August 2003. (Id. ¶ 51.)

Following default, two customers of DWI, Ruskin A. Vest, Jr., and Industrial Products Company, Inc. (the "Vest Plaintiffs"), sued DWI in the Circuit Court for Maury County,

Tennessee.  (See Dkt. No. 1, Ex. 2 ("Vest Compl.").)  They alleged that DWI had violated Tennessee's Blue Sky Laws, breached its fiduciary duties, and committed negligence and common law fraud by failing to disclose to bondholders the deteriorating financial position of the Capstone Development. (Vest Compl. ¶¶ 21-39.)  The case went to trial in state court in January 2008.  (Compl. ¶ 63.)  Before the trial had concluded, the parties agreed to settle all claims.  DWI paid the Vest Plaintiffs $1.2 million, including interest, court costs, and attorneys' fees.  (Id. ¶ 64.)

On January 15, 2009, DWI filed the instant suit in the Chancery Court for Shelby County, Tennessee.  (Id. at 1.)  DWI seeks indemnification from the Defendants for its $1.2 million settlement with the Vest Plaintiffs under the terms of the Bond Purchase Agreement and related contracts.  (Id. ¶¶ 65-140.)  DWI also asserts that it is entitled to contribution from the Defendants for the settlement under the Tennessee Securities Act, Tenn. Code Ann. § 48-2-122(g), and the Uniform Contribution Among Tortfeasors Act, Tenn. Code Ann. §§ 29-11-101 et seq. (Compl. ¶¶ 141-166.)  But see Tenn. Code Ann. § 29-11-102(g) ("This chapter shall not apply to breaches of trust or of other fiduciary obligation.").  Defendants removed Plaintiff's suit to this Court on February 20, 2009.  (See Notice of Removal, Dkt. No. 1.)  Defendants Tanner, Hilburn, and the Borgosz entities

4

then filed the present Motions challenging this Court's personal jurisdiction over them.

### B. Jurisdictional Facts

The Court takes the following facts from the parties' affidavits and DWI's Complaint without considering the Defendants' controverting assertions. See Theunissen v. Matthews, 935 F.2d 1454, 1459 (6th Cir. 1991). DWI began to explore the possibility of serving as underwriter for the Capstone Development in "late February or early March 2000."[2] (Jumper Aff., Dkt. No. 35, Ex. 1, ¶ 4.) As part of its initial investigation, DWI reviewed a draft preliminary offering statement and explanation of the project prepared by Defendant Tanner. (Id. ¶ 3.) Tanner served as counsel to both the Developer and the District. (Guin Aff., Dkt. No. 3*, Ex. 2, ¶ 20.) Tanner has never had an office in the State of Tennessee. (Id. ¶ 10.) None of its attorneys has a license to practice in Tennessee; it does not market its services in Tennessee; and it has never represented DWI as its attorney. (Id. ¶¶ 11-12, 14.) Tanner maintains its offices in Jefferson and Baldwin Counties in Alabama. (Id. ¶ 5.)

Tanner provided a preliminary statement that DWI circulated to its customers, and they had no interest in the Capstone

---

[2] Southwest Securities, which had decided not to underwrite the Capstone Development's bond issuance, approached DWI about replacing it as one of the two underwriters. (Jumper Aff. ¶ 2.)

Development bond issuance as it was then structured. (Jumper Aff. ¶ 6.) When DWI notified Tanner and the Borgosz entities that there was little investor enthusiasm for their proposed bond sale, those Defendants agreed "to restructure the transaction so as to provide greater security" and enable a successful bond sale. (Id. ¶ 7.) Specifically, Tanner and the Borgosz entities supplied DWI with information about possible alternative structures for the bond sale that might address the concerns of potential investors. They took these actions in an effort "to keep DWI involved in the transaction." (Id. ¶ 8.) Tanner provided DWI with "numerous drafts of bond documents" and other information that it submitted to DWI's Memphis office. (Id. ¶ 10.) These documents came from information submitted to Tanner by its clients, the District and the Developer. (Id.) Tanner hoped to replicate whatever form was used in the Capstone Development's bond sale in future transactions with similar developments throughout Alabama. (Id. ¶ 9.)

When DWI agreed to become the co-underwriter for the bond issue, Defendant Hilburn was already representing Southern Financial as underwriters' counsel. (Pruniski Aff., Dkt. No. 5, ¶¶ 6, 8.) Hilburn's attorney, Jack Pruniski, called DWI to confirm that Hilburn could provide the same services to DWI; and DWI accepted Hilburn's representation as underwriters' counsel. (Jumper Aff. ¶ 10.) Hilburn maintains no office in the State of

6

Tennessee; and Pruniski, who has never held a Tennessee law license, performed all work as underwriters' counsel for both Southern Financial and DWI.   (Pruniski Aff. ¶¶ 3, 5, 9.) Hilburn has its primary office in North Little Rock, Arkansas. (Id. ¶ 2.)

Tanner and Hilburn worked together for their respective clients to draft the official statement that would accompany the restructured bond offering.   (Jumper Aff. ¶ 10.)   Throughout this process, DWI had "numerous conversations" by telephone and "exchanged numerous written communications" with Tanner and Hilburn about the documentation they had forwarded to DWI for review.   (Id. ¶ 14.)   Tanner and Hilburn initiated many of these contacts with DWI's Memphis office.   (Id.)   DWI's John Jumper also visited Alabama to conduct due diligence on the project. During that trip, Jumper met with the participants, "spent days in [Tanner's] office reviewing documents," and spoke with Borgosz "several times."   (Id. ¶ 15.)   DWI also negotiated the bond purchase agreement with the District in which the District agreed to sell the bonds to DWI and Southern Financial.   (Id. ¶ 16.)   As part of this process, Hilburn delivered an opinion "addressed to DWI in Memphis, Tennessee . . . that the bonds were lawfully issued" and that the parties had disclosed all facts material to the transaction.   (Id. ¶ 17.)   At no time did Tanner, the District's counsel, inform DWI that there were any

7

problems with any of the District's or the Borgosz entities' disclosures. (Id. ¶ 18.) Both Tanner and Hilburn were aware that it was "essential" to DWI's marketing efforts that the bonds comply with federal tax and securities laws and the securities laws of every state in which the bonds might be sold – particularly the laws of Tennessee and South Carolina, the home states of DWI and Southern Financial. (Id.) The $13 million bond sale closed on April 19, 2000. (Id. ¶ 16.)

After the bond closing, DWI continued to have contact with the Defendants. Borgosz, on behalf of himself and all the Borgosz entities, visited the DWI offices in Memphis to continue to promote the Capstone Development and explain the ongoing construction process to DWI's sales force to assist in marketing the Capstone bonds. (Id. ¶ 20.) Borgosz also "implore[d] DWI to collaborate with him" on a separate bond issue related to the Capstone Development during his Tennessee visits. (Id.) In addition to his trips to DWI's office, Borgosz spoke with Jumper "via telephone, literally, hundreds of times" and sent letters to Jumper at DWI's Memphis office. (Id. ¶ 19.) Hilburn's Pruniski also called Jumper after the bond transaction had closed seeking DWI's advice "about how to structure future improvement district bond issues." (Id. ¶ 25.) DWI continued to rely on Hilburn for legal advice about post-issuance legal matters. Pruniski sent a letter to DWI on April 28, 2000,

8

detailing DWI's potential remedies if the District defaulted on its bond obligations. (<u>Id.</u> ¶ 28.) Hilburn also advised DWI on the details of a potential restructuring of the bond issue and assisted with the Continuing Disclosure Agreement whereby the District and the Developer agreed to disclose any post-issuance material events to DWI and to assume the anti-fraud obligations SEC Rule 15c2-12 imposed. (<u>Id.</u>)

## II.   JURISDICTION, CHOICE OF LAW, AND STANDARD OF REVIEW

Defendants removed this action under the diversity jurisdiction conferred by 28 U.S.C. § 1332(a)(1) and § 1441(a). (Notice of Removal at 1.) Plaintiff DWI is a Tennessee corporation with its principal place of business in Memphis, Tennessee. (Compl. ¶ 1.) Defendants Capstone Development, LLC; Triangle Construction; and Tanner are Alabama limited liability companies. (<u>Id.</u> ¶¶ 2, 8, 5.) Selective is an Alabama corporation with its principal place of business in Pelham, Alabama. (<u>Id.</u> ¶ 4.) University Club Group, Inc. is a Delaware corporation with its principal place of business in South Carolina. (<u>Id.</u> ¶ 6.) Defendants U.C. Properties, LLC and Nexsen Pruet, LLC are South Carolina limited liability companies. (<u>Id.</u> ¶ 7; Notice of Removal ¶ 7.) Hilburn is an Arkansas corporation with its principal place of business in North Little Rock, Arkansas. (Compl. ¶ 9.) Individual Defendant Eugene H. Borgosz is a citizen of the State of

Alabama, and the Capstone Improvement District is a political subdivision of Alabama. (Id. ¶¶ 3, 10.) None of the limited liability companies has Tennessee-domiciled members. (See Defendant Nexsen Pruet, LLC's Supplementation of Petition for Removal, Dkt. Nos. 54-56; Notice by Capstone Development, LLC and Triangle Construction Management, LLC, Dkt. No. 57; Notice by Tanner & Guin, LLC, Dkt. No. 58.) Complete diversity is therefore present, and the amount in controversy is greater than $75,000. (Compl. ¶¶ 64, 166.2.)

A federal court sitting in diversity applies the substantive law of the forum state and federal procedural law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Plaintiff has filed suit under the common and statutory laws of the State of Tennessee. The Court, therefore, will apply Tennessee law to the substantive issues in dispute. Because Plaintiff filed suit in a Tennessee court, the Court also must apply Tennessee's long-arm jurisdiction statute when considering Defendants' Motion. See Tenn. Code Ann. § 20-2-214; Kerry Steel, Inc. v. Paragon Indus., 106 F.3d 147, 148 (6th Cir. 1997) ("A federal court sitting in diversity may exercise personal jurisdiction over an out-of-state defendant only to the extent that a court of the forum state could do so." (citation omitted)).

When presented with a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(2), a federal court has three options:  decide the motion based on the affidavits of the parties; allow the parties to conduct limited discovery on the jurisdictional issue; or hold an evidentiary hearing to resolve disputed questions of fact. Theunissen, 935 F.2d at 1458.  None of the parties has requested an evidentiary hearing; they have chosen instead to present their arguments by affidavit.  In deciding a Rule 12(b)(2) motion based solely on affidavits, the Plaintiff bears the burden of establishing that jurisdiction exists.  Id.  However, it "need only make a prima facie showing of jurisdiction." Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002) (citation omitted).  The Court must view the jurisdictional facts in the light most favorable to the Plaintiff.  Theunissen, 935 F.2d at 1459.  It may "not consider facts proffered by the defendant that conflict with those offered by the plaintiff." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002) (citation omitted).  This standard "does not require a court to ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiff." Kerry Steel, 106 F.3d at 153 (citation omitted).

### III.   ANALYSIS

A court may exercise personal jurisdiction over a defendant if the elements of either general or specific jurisdiction are present.   Id. at 149.   General jurisdiction exists over a defendant when it "has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant."   Id. (citing Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 414-45 & nn.8-10 (1984)).   DWI does not assert that this Court has general jurisdiction over any of the Defendants.   (See Pl.'s Resp. at 16.)   Instead, DWI argues that this Court has specific jurisdiction over each of the objecting Defendants.   (Id.)

State law controls the breadth of the specific jurisdiction the Court may assert.   Kerry Steel, 106 F.3d at 148. Tennessee's long-arm statue provides that a court whose situs is in Tennessee may assert jurisdiction on "[a]ny basis not inconsistent with the constitution of [Tennessee] or of the United States."   Tenn. Code Ann. § 20-2-214(a)(6).   Thus, Tennessee has extended its jurisdictional reach to the full extent permitted by the Due Process Clause of the Constitution. See Masada Inv. Corp. v. Allen, 697 S.W.2d 332, 334 (Tenn. 1985).   When a state has extended its jurisdiction to the full extent allowed by the Constitution, the statutory and

12

constitutional inquiries merge; and the only question the Court must answer is whether exercising jurisdiction over the objecting defendant would violate due process.   Gomberg v. Shosid, No. 1:05-cv-356, 2006 U.S. Dist. LEXIS 45785, at *9 (E.D. Tenn. July 6, 2006).   The Sixth Circuit first stated its longstanding test governing when a state's assertion of jurisdiction over a defendant is proper in Southern Machine Co. v. Mohasco Industries, 401 F.2d 374, 381 (6th Cir. 1968):

> First, the defendant must purposefully avail himself
> of the privilege of acting in the forum state or
> causing a consequence in the forum state.   Second, the
> cause of action must arise from the defendant's
> activities there.   Finally, the acts of the defendant
> or consequences caused by the defendant must have a
> substantial enough connection with the forum state to
> make the exercise of jurisdiction over the defendant
> reasonable.

(footnote omitted); see also e.g., Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000) (applying Mohasco).   If a Plaintiff fails to satisfy all three prongs of the Mohasco test, a court may not exercise personal jurisdiction over that defendant.   LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1303 (6th Cir. 1989).

### A. The Court Has Jurisdiction over Defendant Hilburn

Defendant Hilburn argues that its contacts with Tennessee are not sufficient for the Court to exercise personal jurisdiction over it.   Hilburn asserts that Southern Financial had selected it as underwriters' counsel before DWI agreed to

become a part of the bond transaction. (Defendant Hilburn's
Memorandum in Support of Its Motion to Dismiss at 3.) ("Hilburn
Memo") Thus, the firm had already completed much of the
required legal work. (Hilburn Memo at 3-4.) Hilburn also
argues that, because none of its attorneys ever set foot in
Tennessee and its only contact with DWI was via "phone calls,
faxes, and e-mails between Pruniski and [DWI's] John Jumper,"
the Court lacks personal jurisdiction. (Id. at 4.)

Under the first prong of the Mohasco test, Hilburn must
have "purposefully avail[ed itself] of the privilege of acting
in the forum state." 401 F.2d at 381. Often referred to as the
"sine qua non" of the personal jurisdiction inquiry, id. at 381-
82, the "'purposeful availment' requirement ensures that a
defendant will not be haled into a jurisdiction solely as a
result of 'random,' 'fortuitous,' or 'attenuated' contacts."
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)
(citations omitted). Courts look to the quality of the
defendant's contacts with the forum state, rather than their
number or duration. Calphalon, 228 F.3d at 722. Only the
defendant's purposeful activity counts in the jurisdictional
analysis. Contacts made by a defendant's independent partners
cannot establish personal jurisdiction over the defendant.
Burger King, 471 U.S. at 474. As long as a defendant's actions
are purposefully directed toward the forum state, the fact that

the defendant has never physically visited the forum state cannot defeat jurisdiction. Id. at 476.

The affidavits demonstrate that an attorney-client relationship existed between DWI and Hilburn. (Jumper Aff. ¶ 10.) Indeed, when DWI agreed to join the Capstone bond offering, Hilburn's attorney Pruniski called DWI to inquire whether Hilburn could also serve as DWI's counsel (Id.; Compl. ¶ 130.) Hilburn reviewed and helped to draft the official statement that was to accompany the bonds' issuance. (Jumper Aff. ¶ 10.) During this process, Hilburn exchanged numerous telephone calls, faxes, and letters with DWI employees. (Id. ¶ 14.) Hilburn delivered all of its official opinions about the propriety of the proposed prospectus to DWI's Memphis office. (Id. ¶ 17.) Hilburn understood that DWI's ability to resell the bonds to its customers hinged on the official statement's satisfying not only the requirements of federal law, but also Tennessee law. (Id. ¶ 18.) Following DWI's purchase of the bonds, Hilburn continued to provide legal advice about the transaction and, importantly, sought DWI's advice on how it could structure similar bond transactions. (Id. ¶¶ 25, 28.)

These facts satisfy the first prong of the Mohasco test. Far from being a random encounter marked by an "isolated transaction," Hilburn agreed to serve as DWI's counsel and attempted to develop the relationship by discussing its other

clients who might wish to structure similar bond sales. See Burger King, 471 U.S. at 479 (prior contract negotiations and contemplated future business dealings result in purposeful availment); Calphalon, 228 F.3d at 728 (reaching out to a foreign state and creating a continuing relationship triggers personal jurisdiction); cf. Kerry Steel, 106 F.3d at 151 (one-time contract that marked only an "isolated transaction" cannot trigger personal jurisdiction in plaintiff's home state). Although the "literally[] hundreds" of telephone calls and other communications between Hilburn and DWI's Memphis office cannot establish purposeful availment by themselves, they are an important secondary consideration that points to the existence of a more-than-fortuitous relationship. See LAK, 885 F.2d at 1301 ("A numerical count of the calls and letters has no talismanic significance: The quality of the contacts as demonstrating purposeful availment is the issue." (internal quotation marks and citation omitted)); Gomberg, 2006 U.S. Dist. LEXIS 45785, at *13. Hilburn directed its attention, analysis, and opinions toward its Tennessee client with the knowledge that its actions would have consequences for DWI and its Tennessee customers. Burger King, 471 U.S. at 473-74 (Where one "purposefully derive[s] benefit" from interstate activities, it is unfair not to find jurisdiction.); id. at 476 (absence of physical contact with the forum state cannot defeat jurisdiction

if defendant's activity purposefully directed toward forum). Through its representation of DWI and its efforts to foster a more substantial relationship with DWI, Hilburn purposefully availed itself of the privileges of acting in Tennessee and causing a consequence in Tennessee.

The second prong of the Mohasco test requires that the plaintiff's cause of action "arise from the defendant's activities" in the forum state. 401 F.2d at 381. This test is more lenient than that for purposeful availment: "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that" contact. Id. at 384 n.29 (citations omitted). The harm that DWI alleges – the damages it had to pay the Vest Plaintiffs – arose directly from Hilburn's actions directed toward Tennessee. Because Hilburn is alleged to have failed to vet the District's and the Borgosz entities' material disclosures properly, the information DWI provided to its customers was inadequate, requiring DWI to pay damages to the Vest Plaintiffs. (Compl. ¶ 144.) Viewed in the light most favorable to DWI, had Hilburn properly interpreted Tennessee law, it would have advised DWI not to sell the Capstone bonds to its customers. The economic harm of which Plaintiff complains, therefore, is directly related to the actions Hilburn directed

toward the forum state.  *See* *Neogen Corp.*, 282 F.3d at 888.  DWI has satisfied the requirements of the second prong.

*Mohasco*'s final prong asks whether the Court's exercise of jurisdiction over the defendant would be reasonable.  401 F.2d at 381.  Where the first two requirements are met, there is a presumption that the requirements of the third prong are also satisfied.  *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005); *Mohasco*, 401 F.2d at 384 (finding that, where the first two factors are met, it is only the rare or "unusual" case that will fail to satisfy the third).  Tennessee, the forum state, has a more than *de* *minimus* interest in adjudicating the present dispute.  The allegedly harmed party, DWI, is a Tennessee resident.  *Mohasco*, 401 F.2d at 385 (Where the harmed party is a resident of the forum state, the forum state's interest "cannot be doubted." (citations omitted)).  Hilburn's faulty legal analysis allegedly also led numerous other Tennessee residents, like the Vest Plaintiffs, to suffer harm by inducing them to purchase securities without all the material facts.  It is thus reasonable that Hilburn should have to defend itself in Tennessee.  DWI has demonstrated that the Court has *prima* *facie* jurisdiction over Hilburn; and the Court, therefore, DENIES Hilburn's Motion to Dismiss.  *See* *Masada*, 697 S.W.2d at 335 (holding that personal jurisdiction existed over out-of-state attorney who performed legal work that was a "vital

18

component of th[e] transaction" when he drafted documents in accord with Tennessee law and conversed with Tennessee parties regularly about the transaction for the sale of property in Tennessee).

### B. The Court Does Not Have Jurisdiction over Defendant Tanner

Defendant Tanner also asserts that Tennessee's long-arm statute cannot support the Court's assumption of jurisdiction over it. Tanner argues that its contacts with DWI were limited to its role as counsel to the District and the Developer. (Defendant Tanner & Guinn LLC's Memorandum in Support of Its Motion to Dismiss at 4.) Tanner notes that the mere fortuity of the District's and the Developer's choosing it as their counsel brought Tanner into contact with DWI. (Id.) Thus, Tanner did not purposefully initiate any contacts with Plaintiff. It responded on behalf of its clients to DWI's and Hilburn's due diligence requests. (Id. at 4-5.)

Applying the first prong of the Mohasco test, Tanner has not purposefully availed itself of the protections of Tennessee law. Unlike Defendant Hilburn, Tanner did not form an attorney-client relationship with DWI. (Guin Aff. ¶ 20; Jumper Aff. ¶ 9.) Instead, the District and the Developer selected Tanner as their counsel for the bond offering. (Guin Aff. ¶ 20.) DWI does not assert that Tanner solicited DWI to serve as an

underwriter.   (See Jumper Aff. ¶ 2 (noting that Southwest Securities first approached DWI about taking Southwest's place as an underwriter).)   Tanner did respond to DWI's requests for information from the District and the Developer to assist DWI in deciding whether to purchase the Capstone bonds.   (Jumper Aff. ¶ 10.)   However, the location of the securities firms was irrelevant to Tanner:   Tanner would have served as its clients' conduit regardless of where DWI chose to locate its headquarters.   See Calphalon, 228 F.3d at 723 (finding no personal jurisdiction in plaintiff corporation's home state, although defendant was a sales agent for the corporation, because defendant "would have served as [plaintiff's] representative in the designated states, regardless of [plaintiff's] base of operation.")   Although DWI argues that Tanner wanted to replicate the Capstone bond structure for its other Alabama clients, DWI does not assert that Tanner sought to form a continuing relationship with DWI to accomplish that task. (See Jumper Aff. ¶ 9.)   No Tanner attorney met with DWI to solicit future business or to seek DWI's advice about how DWI could assist Tanner's other clients.   (Cf. id. ¶ 25 (noting that, by contrast, Hilburn did seek such advice from DWI).) Finally, the post-bond-sale contractual reporting requirements obligated Tanner's clients to provide information, not Tanner itself.   See Hanson v. Denckla, 357 U.S. 235, 253 (1958) ("The

unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.")   Tanner was not a party to the Continuing Disclosure Agreement.  (See Compl. ¶ 28.)

Tanner's interaction with DWI was a one-time transaction resulting from the double fortuities of Tanner's selection by the District and the Developer as their counsel and DWI's replacement of Southwest Securities as an underwriter.  Kerry Steel, 106 F.3d at 151 (isolated transactions do not create specific personal jurisdiction).   The parties contemplated no continuing relationship, contractual or otherwise.  See Burger King, 471 U.S. at 476 (noting the importance of creating "continuing obligations" in the forum state to the jurisdictional analysis).   DWI has failed to demonstrate the "sine qua non" of personal jurisdiction:  purposeful availament. Mohasco, 401 F.2d 381-82.  The Court, therefore, GRANTS Tanner's Motion to Dismiss for Lack of Personal Jurisdiction.[3]

### C. The Borgosz Entities Are Subject to the Court's Jurisdiction

Capstone Development, LLC; Selective; Triangle Construction; and Borgosz – the Borgosz entities – contest the

---

[3] Although DWI's failure to demonstrate that Tanner satisfies the first prong of the Mohasco test is sufficient to thwart personal jurisdiction, LAK, 885 F.2d at 1303, DWI has also failed to demonstrate that the actions it complains of arose in Tennessee.   Mohasco, 401 F.2d at 381.   DWI's allegations essentially concern the adequacy of Tanner's representation of its clients, which took place solely in Alabama and concerned an Alabama real estate project.  (See Compl. ¶ 150.)

Court's personal jurisdiction.   Because the Borgosz entities filed a joint Motion to Dismiss, do not make individualized arguments about each entity, and are controlled by Borgosz or have him as their principal agent, they must be considered together to determine jurisdiction.   (See Memorandum of Borgosz and the Borgosz Entities in Support of Their Motion to Dismiss at 11-18.)   ("Borgosz Memo")   The Borgosz entities argue that a Tennessee court has no personal jurisdiction to adjudicate a dispute centered on a failed Alabama real-estate development. (Borgosz Memo at 11-14.)

It is undisputed that the Borgosz entities do not maintain an office, mailing address, or telephone listing in Tennessee. (Borgosz Aff., Dkt. No. 15, ¶ 10.)   Their officers, employees, or members do not reside in Tennessee.   (Id. ¶ 9.)   However, the affidavits demonstrate that the Borgosz entities' interactions with DWI were more than a one-time encounter.   Before DWI agreed to serve as an underwriter for the Capstone bond sale, the Borgosz entities sought DWI's advice about how they might restructure the bond transaction to appeal to and placate the concerns of investors.   (Jumper Aff. ¶ 7.)   They provided DWI with information about the Capstone Development to assist in restructuring the bond sale.   (Id. ¶ 8.)   They directed these communications to DWI's office in Memphis.   (Id.)   After DWI and Southern Financial purchased the bonds on April 19, 2000,

22

Borgosz, acting on behalf of the Borgosz entities, traveled to DWI's headquarters "to promote and explain" the Capstone Development.  (Id. ¶ 20.)  Borgosz' explanations allowed DWI employees to remain up-to-date on the project's progress, assisting them in selling the bonds to their clients.  (Id.)  He made a second, post-sale trip to Tennessee to update DWI officials on the construction of the Capstone Development and to solicit more capital from DWI to complete an element of the Capstone Development unfunded by the initial bond sale.  (Id.)  The Developer, a Borgosz entity, was a party to the Continuing Disclosure Agreement, obligating it to inform DWI of any material change in circumstances that would imperil the District's ability to make timely payment on the bonds.  (Id. ¶ 28.)  Throughout the entire transaction, DWI's Jumper spoke with Borgosz via telephone "hundreds of times" and received extensive written correspondence from Borgosz.  (Id. ¶ 19.)

The Borgoz entities, thus, sought a continuing relationship with DWI.  A contract bound them to make continued disclosures, and they had hopes of convincing DWI to finance related real-estate ventures.  Cf. Kerry Steel, 106 F.3d at 151 (more than a single contract covering a single transaction required to establish jurisdiction).  Borgosz came to Tennessee to assist DWI in its efforts to sell the Capstone bonds.  His travel and his attempts to secure more funding for other projects were

23

purposeful acts taken to build a business relationship with DWI. See Burger King, 471 U.S. at 474. The Borgosz entities derived substantial benefit from Borgosz' actions; namely, the continued effort of DWI's sales force to promote and re-sell the Capstone bonds. See id. at 473-74 (When one "purposefully derive[s] benefit" from interstate activities, it may be unfair to fail to find jurisdiction.). In making these representations to DWI employees in Tennessee, Borgosz knew that DWI would repeat his assurances to its skeptical Tennessee customers. (Jumper Aff. ¶ 20.) This activity, specifically directed toward Tennessee, establishes that DWI has met the purposeful-availment prong of the Mohasco test.

DWI has also established the second prong – that the present action arose out of the Borgosz entities' contacts with Tennessee. Mohasco, 401 F.2d at 381. DWI's Complaint alleges that the Borgosz entities misled it about the solvency of the Capstone Development and that those misrepresentations, particularly those made during Borgosz' trips to Tennessee, forced it to settle the Vest Plaintiffs' suit. The economic harm DWI suffered arose out of the Borgosz entities' actions in Tennessee. See Neogen Corp., 282 F.3d at 888. DWI has satisfied the requirements of the second prong.

Requiring the Borgosz entities to defend their actions in a Tennessee court is reasonable. See Mohasco, 401 F.2d at 381.

"A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." Burger King, 471 U.S. at 473 (citations omitted).  That interest is heightened where the alleged misrepresentations, some of which occurred in Tennessee, injured a Tennessee company whose sale of bonds then injured other Tennessee residents.  Cf. Mohasco, 401 F.2d at 385 (Where the harmed party is a resident of the forum state, the forum state's interest "cannot be doubted." (citations omitted)).  DWI has demonstrated that the Court has prima facie jurisdiction over the Borgosz entities, and the Court, therefore, DENIES their Motion to Dismiss.

    **IV.   CONCLUSION**

    For the foregoing reasons, the Court finds that it has personal jurisdiction over Defendants Hilburn and the Borgosz entities and consequently DENIES their Motions to Dismiss.  The Court does not have personal jurisdiction over Defendant Tanner.  Tanner's Motion to Dismiss is GRANTED.  Because the Court has now ruled on all pending jurisdictional objections, the stay entered on July 2, 2009, prohibiting the parties from moving forward with any non-jurisdictional matters is LIFTED.  (See Order on Motion to Stay, Dkt. No. 52, at 2.)

    So ordered this 7th day of July, 2010.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE